UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cr-00485-SRC |
| | ) | |
| EUGENE WOODS, | ) | |
| | ) | |
| Defendant. | ) | |

## Memorandum and Order

Eugene Woods has three pending pretrial motions before the Court:  (1) a motion to dismiss, doc. 32; (2) a motion to suppress statements, doc. 33; (3) and a motion to suppress evidence, doc. 34.

## I.    Procedural history

The Court referred Woods's motions to United States Magistrate Judge John M. Bodenhausen pursuant to 28 U.S.C. § 636(b).  *See* doc. 1.  On August 25, 2025, Judge Bodenhausen issued a Report and Recommendation, recommending that the Court:  (1) deny Woods's Motion to Dismiss, doc. 32; (2) grant Woods's Motion to Suppress Statements Under the Fifth Amendment and *Miranda v. Arizona*, doc. 33; and (3) deny Woods's Motion to Suppress Evidence Under the Fourth Amendment, doc. 34.  Doc. 58 at 33 (The Court cites to page numbers as assigned by CM/ECF.).  Woods filed timely objections to the R&R, doc. 59, the United States responded to Woods's objections, doc. 61, and Woods filed a reply, doc. 62.

## II.    Standard

When a party objects to a magistrate judge's R&R, the district judge must conduct a de novo review of the portions of the report, findings, or recommendations to which the party

objects.  *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (citing 28 U.S.C. § 636(b)(1)).  In making its de novo determination, the Court reviewed the record related to Woods's motions.

## III.    Statement of facts

For convenience, the Court includes the findings of fact from the R&R with supporting citations.  The Court has noted any modifications, based on its de novo review, below.

> Preston Billingsley is a patrol officer with the City of Hazelwood, Missouri, Police Department.  [Doc. 54, Evid. Tr. at 61:17–62:10.]  As of the evidentiary hearing, Officer Billingsley had about six years of law enforcement experience, including four with Hazelwood.  [*Id.*]  Officer Billingsley is assigned to "the neighborhood patrol group."  [*Id.* at 62:5–62:6.]  His duties include responding to calls for service and patrolling within the city limits.  [*Id.* at 62:17–62:20.]

> At about 7:17 a.m., on July 6, 2024, Officer Billings[ley] was dispatched to a Phillips 66 gas station relative to a reported theft from a vehicle.  [Doc. 54, Evid. Tr. at 62:21–63:6.]  Officer Billings[ley] testified that the victim parked his work truck next to the gas station while visiting a neighboring establishment.  [*Id.* at 63:15–63:17.]  When the victim returned, "he discovered that his shoulder strap bag was missing from his work vehicle."  [*Id.* at 63:17–63:19.]  The victim reported that the bag contained a Glock 17 firearm.  [*Id.* at 64:1–64:7.]  Officer Billingsley reviewed video surveillance footage from the gas station and observed a male exit a Jeep Cherokee, enter the work truck, exit with the victim's bag, and drive away in the Jeep.  [*Id.* at 64:20–64:24.]

Doc. 58 at 2.

The Court notes that the R&R uses "Officer Billings" at times, *see, e.g., id.* at 2, but the Court finds that the correct spelling is "Officer Billingsley."  Doc. 54, Evid. Tr. at 61:4–61:7.

> Officer Billingsley explained that the City of Hazelwood uses a license plate reader system called "Flock."  [*Id.* at 65:8–65:9.]  Using the Flock system, he was able to identify the license plate on the Jeep Cherokee he observed in the gas station surveillance footage.  [*Id.* at 65:9–66:4.]  Officer Billingsley explained that the Jeep in the surveillance footage had distinctive stickers that were visible in the images obtained from the Flock system.  [*Id.* at 65:16–65:22.]  With this information, he

was able to identify the license plate information for the Jeep Cherokee, and thereafter "positively identify" the make, model, and VIN of the suspect's vehicle. [*Id.* at 66:2–66:4.]

Officer Billingsley testified that REJIS is a law enforcement tool used to share information between law enforcement agencies in the area. [*Id.* at 66:7–66:11.] Officer Billingsley entered the Jeep Cherokee information into the REJIS database as a vehicle that was wanted relative to the bag and firearm theft. [*Id.* at 66:7–66:18.] He also entered the stolen firearm into REJIS. [*Id.* at 66:19–66:21.]

Doc. 58 at 2–3.

The Court notes that the R&R states that Officer Billingsley entered the Jeep into the REJIS database as a vehicle wanted relative to the bag and firearm theft, *id.* at 3, but the transcript specifies that the Jeep was entered as wanted for stealing a firearm from a vehicle (not the bag). *See* doc. 54, Evid. Tr. at 66:7–66:18.

Joel Carvajal is a patrol officer with the St. Louis Metropolitan Police Department (SLMPD). [*Id.* at 8:2–8:22.] As of the evidentiary hearing, Officer Carvajal had about two years of experience. [*Id.* at 8:5–8:8.] Officer Carvajal's duties include responding to calls for service. [*Id.* at 8:13–8:17.]

Officer Carvajal was on duty during the late-afternoon/early-evening hours of July 6, 2024. [*Id.* at 8:18–8:20.] At that time, he was operating alone in a marked patrol car in the area of Hampton Avenue and I-44. [*Id.* at 8:23–9:3, 12:1–12:5.] At about 5:50 p.m., Officer Carvajal received information regarding a "license plate reader hit" for a Jeep Grand Cherokee that was wanted out of Hazelwood. [*Id.* at 10:7–10:22, 11:11–11:17.] Officer Carvajal testified that the information was relayed from a detective in the "real-time crime center" (RTCC) which is a camera unit. [*Id.* at 10:25–11:12.] He further explained that the information was relayed first from RTCC and then from the dispatcher. [*Id.* at 11:20–11:25.] The Jeep was located at a QuikTrip on Hampton Avenue, which was about 30 seconds from Officer Carvajal's location. [*Id.* at 12:6–12:20.]

At the hearing, the [United States] played portions of the dispatch recording, [Ex. 2 at 00:00–3:49], which included the report from the RTCC detective, [*see* doc. 54, Evid. Tr. at 13:20–16:2.] The detective advised that there was a green Jeep Grand Cherokee on the lot of the QuikTrip and that the vehicle was "wanted for stealing a firearm today" out of Hazelwood. [Ex. 2 at 00:23–00:45.] Officer Carvajal testified that he also communicated with the RTCC detective via cell phone so that the detective could instruct Officer Carvajal where the Jeep was located. [Doc. 54, Evid. Tr. at 15:15–15:23.] The dispatch recording corroborates his testimony. [*See* Ex. 2 at 00:00–3:49.]

3

> Once Officer Carvajal positively identified the Jeep Cherokee in question, he
> noticed that it was unoccupied, so he positioned his patrol vehicle on the other side
> of the parking lot. [ Doc. 54, Evid. Tr. at 16:21–17:6.] Officer Carvajal observed
> a man, later identified as Woods, "running out of the QuikTrip with numerous
> items." [*Id.* at 17:22–18:3.] Officer Carvajal activated the lights and siren of his
> marked vehicle and positioned it to prevent Woods from driving away. [*Id.* at 19:4–
> 19:5.] Officer Carvajal testified that he observed Woods to be wearing a chest bag
> or cross-body bag across his chest, and that he knew it was easy to hide and retrieve
> firearms with such bags. [*Id.* at 19:15–20:7.]

Doc. 58 at 3–4.

The Court notes that while the R&R was unclear as to whether Officer Carvajal observed

the bag before or after he drew his gun, the Court finds that the transcript supports that Officer

Carvajal observed the bag after he had drawn his gun. *See* doc. 54, Evid. Tr. at 19:7–19:20.

> Officer Carvajal drew his weapon, pointed it at Woods, and directed him to exit the
> vehicle and to lay on the ground. [*Id.* at 19:6–19:14, 20:13–20:17.] Officer
> Carvajal testified that he observed Woods reach for the bag with his right hand. [*Id.*
> at 21:9–21:14.] Woods eventually complied and went to the ground. [*Id.* at 20:16–
> 20:20.] Officer Carvajal removed the bag from Woods and tossed it to the side.
> [*Id.* at 38:22–39:10.] Officer Carvajal explained that he took these actions because
> he considered this to be a "felony stop" and he had safety concerns. [*Id.* at 20:24–
> 21:14.]
>
> The body camera and dash camera recordings in evidence corroborate Officer
> Carvajal's testimony concerning the initial moments of his encounter with Woods.
> [*See* Ex. B (Officer Carvajal's dash camera) at 00:00–2:00; Ex. B (Officer
> Carvajal's body camera) at 0:00–2:05.] For example, Woods was slow to exit the
> Jeep and when he did, he was wearing a one-strap, cross-body bag which would be
> the same as or similar to the bag stolen earlier that day. [Ex. B (Officer Carvajal's
> body camera) at 00:34–1:07.] The video confirms that Woods reached for the bag,
> and Officer Carvajal's reaction is entirely consistent with an officer's reasonable
> safety concerns. [*Id.* at 1:04–1:34.]

Doc. 58 at 4–5.

The Court notes that when Officer Carvajal tells Woods, "Don't f*cking reach, dude,"

Woods responds with, "I'm not, bro. I ain't got nothing. Check it, bro. Ain't nothing in there,

man." Ex. B (Officer Carvajal's body camera) at 1:20–1:30. Based on the video, it appears that

Officer Carvajal and Woods are discussing Woods's reaching for the bag. *See id.* Woods's

request to have Officer Carvajal search his bag came before his hands were handcuffed, but

while Officer Carvajal had his firearm drawn. *See id.*

> Shortly after Officer Carvajal ordered Woods to the ground, another officer arrived. [*Id.* at 21:15–21:18; *see also* Ex. B (Officer Carvajal's body camera) at 01:20–1:35.] Officer Carvajal handcuffed Woods for safety reasons while the police further investigated the situation. [Doc. 54, Evid. Tr. at 21:19–22:3.] Officer Carvajal testified that he handcuffed Woods within about one minute of his first contact with him. [*Id.* at 38:19–38:21; *see also* Ex. B (Officer Carvajal's body camera) at 00:36–1:50.] The officers contacted the Hazelwood Police who requested that the SLMPD officers "sit with the [Jeep] until they got some people out there to tow the vehicle." [Doc. 54, Evid. Tr. at 22:4–22:9.] The Hazelwood Police also asked the SLMPD officers to hold Woods for further questioning. [*Id.* at 22:10–22:17.]
>
> After securing Woods, Officer Carvajal confirmed that Woods ran out of QuikTrip because Woods had stolen "a couple of hot dogs [and] a drink." [*Id.* at 22:22–23:13.]

Doc. 58 at 5.

The Court notes that the transcript reflects that the prosecutor asked Officer Carvajal

what he learned when he went into the "7-Eleven," which the Court believes was a mistaken

reference to QuikTrip, since "7-Eleven" doesn't bear any relevance to this case. Doc. 54, Evid.

Tr. at 22:22–23:13.

> The officers also ran a record check and learned that Woods had an outstanding bench warrant from the City of St. Louis. [*Id.* at 23:14–23:18.] According to records produced by the [United States, Ex. 3], the warrant was issued in May 2021, with a bond set at $250. The officers eventually decided to arrest Woods on the outstanding warrant and for stealing from QuikTrip. [*Id.* at 27:21–28:3.]

Doc. 58 at 5.

The Court notes that Officer Carvajal testified that Woods was also arrested on "his

wanted card from Hazelwood." Doc. 54, Evid. Tr. at 27:21–28:3.

> Based on the request from the Hazelwood police, the SLMPD police did not search the Jeep but generally secured the scene. [*Id.* at 28:7–28:24.] Officer Carvajal

testified that, had Hazelwood not requested that the SLMPD hold the Jeep, the SLMPD would have inventoried the Jeep prior to having it towed. [*Id.* at 28:25–29:12.] This testimony was corroborated by the body camera recording submitted as evidence wherein the officers can be heard discussing inventorying the Jeep. [Ex. C at 43:20–45:20.]

During the evidentiary hearing, it was revealed that two Glock firearm magazines were recovered from the bag by an officer named Taluva, and that the SLMPD officers placed the bag and magazines inside the Jeep. [Doc. 54, Evid. Tr. at 44:5–45:1; Ex. C at 40:00–45:20.] Those items were not inventoried or documented by the SLMPD in any report. [*Id.* at 45:13–46:17.] Officer Carvajal testified that such information probably should have been in a report. [*Id.*]

Based on the available record, it appears [to Judge Bodenhausen] from the video recordings and hearing testimony that the SLMPD officers were in contact with the Hazelwood Police via cell phone, and that the Hazelwood Police asked the SLMPD officers to place the bag and magazines in the Jeep for them. [*See* doc. 54, Evid. Tr. at 28:7–28:15; Ex. C at 43:00–44:50.] Officer Carvajal, who was a relatively new officer at the time[, *see* doc. 54, Evid. Tr. at 8:5–8:8,] asked his more experienced officers how to handle this situation and complied with their directions. [*Id.* at 51:15–51:23.] Some of this exchange was included in [Woods's] Exhibit C, which was a portion of the body camera recording of SLMPD Officer Curt.

Officer Billingsley testified that he spoke with an officer on the scene of the QuikTrip incident and that the suspect's description led Officer Billingsley to conclude that it was the same person he suspected of the theft earlier that day. [Doc. 54, Evid. Tr. at 67:11–67:23.] Officer Billingsley also learned that the [sic] Woods was going to be arrested by the SLMPD so he put in a wanted for Woods so that he would be held. [*Id.* at 67:24–68:5.]

Most of the details regarding the towing and search of the Jeep are not in the record. The hearing transcript and exhibits establish that, during the morning of July 7, 2024, Hazelwood Detective Makil Walker applied for and received a warrant to search the Jeep. [*Id.* at 68:24–70:17; Ex. 1A; Ex. 1B; Ex. 1C.] The warrant was issued by St. Louis County Judge Dillon-Amelung. [Doc. 54, Evid. Tr. at 70:9–11; Ex. 1C.] Officer Billingsley testified that, based on the warrant, the police searched the Jeep and recovered the victim's shoulder bag, the firearm, magazines, and drug paraphernalia. [*Id.* at 70:19–71:9.]

Also on July 7, 2024, Officer Billingsley retrieved Woods from the St. Louis Justice Center and transported him to Hazelwood where he was booked for the theft. [*Id.* at 71:10–71:19.] After booking him, Officer Billingsley placed Woods in a suspect interview room and advised him of his *Miranda* rights using a written form. [*Id.* at 72:7–73:20; Ex.4; Ex. 5.] [Judge Bodenhausen found] that Woods was provided constitutionally satisfactory *Miranda* warnings, he understood his rights, he reviewed the form, and he clearly indicated he did not want to speak when he wrote

6

"NO" next to the portion of the form which read, "Knowing and understanding your rights and under no promises, threats, or other coercion of any kind, do you wish to talk about this incident at this time." [Ex. 4.] Thereafter, Woods changed his mind and decided to speak with Officer Billingsley. [Ex. 5 at 00:00–05:20.]

What happened between the time Woods invoked his right to remain silent and when he changed his mind is best understood by reference to the video recording of the interview, which is documented in [the United States'] Exhibit 5. With his Motion to Suppress Statements[, doc. 33,] Woods offered a transcript of the relevant exchange between Officer Billingsley and Woods. [Doc. 33 at 3–5.] The [United States] has not disputed the accuracy of that transcript. [Judge Bodenhausen] reviewed the proffered transcript and the recording and [found] that the transcript appears sufficiently accurate. Accordingly, it is reproduced as follows:

Billingsley:     And then here it's asking, do you want to talk yes or no? So you just type, write in yes or no. Sign, print. You're gonna read this statement here. Just make sure it's all okay with you.

Woods:     Right here? [*reading quietly*]

Billingsley:     Yes or no, and then print. And sign.

Woods:     So what if I don't want to talk about it?

Billingsley:     If at any point when we start talking and you wish to stop talking, you can do that. So if you say yes now and then we start having a conversation and you change your mind later on, you can do that.

Woods:     Well, I mean, what about, like, don't want to talk right now?

Billingsley:     Then I'm gonna present my case as is to St. Louis County with or without your statement.

Woods:     It don't make no sense for me to say nothing because you know what I'm saying. You will present it anyway, right?

Billingsley:     Yeah, but I think your cooperation probably goes a long way with, with the prosecution and our judge. So if we talk and whatever statements you make, if it's clean and honest statements, I'm sure that'll go a long way. If you refuse to talk, then they only have my side of the story, they only have my evidence. And you haven't offered any statements to refute or to say, yeah, uh, you know what, I messed up or not, so it's really up to you.

Woods:     [*writes "NO" on the form asking if he wishes to talk about the incident*]

7

Billingsley:    [*sees Woods write "NO" and asks:*] Okay. You don't want to make a statement?

Woods:    [*Shakes head no*]

Billingsley:    All right. Do you know why you're here?

Woods:    Yeah.

Billingsley:    For what?

Woods:    They say I stole that gun off the, um, gas station lot or something.

Billingsley:    Okay, yep.  That's pretty much.  That's the, that's the thing. So if you don't want to talk.  You don't have to talk about it. I have more than sufficient evidence to move forward.

Woods:    Yeah, but, um like, I'm not being no a-hole or nothing bad, not talking.  I just don't want to, know what I'm saying, put myself in a worser position, man.  You know what I'm saying?

Billingsley:    I understand.  Well, I. I think it's already a position, but it's gonna be.  It is what it is.  Come on.

Woods:    You said [unintelligible]?

Billingsley:    Yeah.

Woods:    Come on, man.  We can talk.

Billingsley:    So you do want to talk?  Okay.

Woods:    I mean, is it gonna make it any better for me, man?

Billingsley:    Me personally, I would say being honest and truthful, I can tell the judge and prosecutor that.

Woods:    Yeah. I'm not, uh, being untruthful.  I'm just ain't saying nothing. Uh, you know what I'm saying?  I mean, you say you already got the case, so what we need to talk about?

Billingsley:    I think your cooperation will show your willingness to the prosecution that you want to resolve this and do right.  That's all I'm saying.

8

| Woods: | Hey man, look – |
|---|---|
| Billingsley: | I'm not gonna. You said no, I'm not gonna force you into. If you don't want to talk that's fine. |
| Woods: | But I don't want you to invent, you know, be all, you know, in your feelings and try to dog me out about it. |
| Billingsley: | I'm not in my feelings. Look, don't. Look, I've built the case. The evidence will speak for itself. I don't have to say a word to the prosecution. All I gotta do is hand them a report with all of my evidence, and they gonna make a decision. I don't even have to say anything. So you talking or not talking is no disrespect to me. All right? |
| Woods: | Look, come on, man, I'm gonna make a statement. |
| Billingsley: | All right have a seat. |

[Ex. 5 at 00:00–5:20; *see also id.*]

About five minutes total elapsed from the time Woods and Officer Billingsley entered the interview room until Woods indicated he wanted to make a statement. [S*ee* Ex. 5 at 00:00–5:20.] After Woods stated that he wanted to make a statement, the parties sat back down at the table in the interview room. [*Id* at 05:14–05:20.] Officer Billingsley crossed out the "NO" on the warning and waiver form, wrote down "YES" and asked Woods to initial the form next to the word "YES." [*Id.* at 05:25–05:35; Ex. 4.] Woods initialed the form. [Ex. 5 at 05:35–05:39.] Thereafter, Officer Billingsley briefly summarized the evidence he had, including video evidence showing Woods stealing the bag from the truck. [*Id.* at 05:55–6:20.]

Officer Billingsley testified that he interviewed Woods a second time, about an hour later, in the holding area. [Doc. 54, Evid. Tr. at 96:5–96:21.] He did not provide new Miranda warnings. [*Id.* at 101:9–101:19.] He testified that it was his normal practice to say something like, "'With your rights in mind,' and ask whatever questions that need to be asked." [*Id.*] This second interview was not recorded and was only addressed briefly by the parties during the evidentiary hearing. [*Id.* at 96:22–97:9.]

Doc. 58 at 5–10.

IV.    **Discussion**

A.    **Motion to dismiss**

"[T]o preserve the issue for further review," Woods objects to the Judge Bodenhausen's recommendation to deny his Motion to Dismiss.  Doc. 59 at 1–2.  Having reviewed the record, the Court agrees with Judge Bodenhausen's conclusion that Eighth Circuit precedent requires the Court to deny Woods's Motion to Dismiss, doc. 32, and overrules Woods's objection, doc. 59 at 1–2.  *See* doc. 58 at 10.

B.    **Motion to suppress statements**

Judge Bodenhausen recommends granting Woods's Motion to Suppress Statements, detailing his reasoning with a lengthy and thoughtful analysis.  Doc. 58 at 26–33.  The United States has not filed any objection to the Judge Bodenhausen's findings or conclusions on the Motion to Suppress Statements.  *See* doc. 61 at 3 n.1.  Accordingly, the Court adopts Judge Bodenhausen's findings and conclusions of law related to Woods's Motion to Suppress Statements, doc. 58 at 26–33, and grants Woods's Motion to Suppress Statements, doc. 33.

C.    **Motion to suppress evidence**

Woods objects to Judge Bodenhausen's recommendation to deny his Motion to Suppress Evidence.  Doc. 59 at 2–6.  The Court addresses each of Woods's objections issues in turn.

1.    **Detention of the Jeep and Woods**

Woods objects to the Judge Bodenhausen's "conclusion that the initial seizure and detention were investigatory stops that need only meet the reasonable-suspicion standard from *Terry v. Ohio*, 392 U.S. 1 (1968)."  Doc. 59 at 2.  Additionally, Woods objects to Judge Bodenhausen's "conclusion that Officer Carvajal had reasonable suspicion to detain the Jeep and Mr. Woods at the QuikTrip."  *Id.* at 3.  Woods argues that his initial seizure "was a de facto arrest

10

requiring probable cause." *Id.* at 2. Woods raised this argument in his motion, *see* doc. 34 at 6–7, but it was not addressed in the R&R, *see* doc. 58.

The Fourth Amendment protects against "unreasonable . . . seizures." U.S. Const. amend IV. The Supreme Court has held that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. 1, 30 (1968)). "In making reasonable-suspicion determinations, reviewing courts 'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.'" *United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "In developing this suspicion, officers may 'rely on information provided by other officers as well as any information known to the team of officers conducting the investigation.'" *United States v. Johnson*, 31 F.4th 618, 622 (8th Cir. 2022) (quoting *United States v. Allen,* 705 F.3d 367, 370 (8th Cir. 2013)).

"An investigative detention may start lawfully yet not stay that way." *Pollreis v. Marzolf*, 9 F.4th 737, 744 (8th Cir. 2021). "[A]n initially reasonable investigative stop can become unreasonable if it was 'excessively intrusive in its scope or manner of execution.'" *Id.* at 745 (quoting *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011)). "A de facto arrest takes place "if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Raino,* 980 F.2d 1148, 1149 (8th Cir. 1992) (citation omitted). "To establish an unreasonably prolonged detention, the [complaining party] must show that the officer detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without

11

reasonable suspicion." *United States v. Donnelly*, 475 F.3d 946, 951–52 (8th Cir. 2007). The

Eighth Circuit has "observed that this line 'can be hazy.'" *Pollreis*, 9 F.4th at 745 (citation

omitted). "An investigative detention can become an arrest if it 'lasts for an unreasonably long

time or if officers use unreasonable force.'" *Id.* (quoting *Waters v. Madson*, 921 F.3d 725, 736

(8th Cir. 2019)). "There is 'no rigid time limitation on *Terry* stops,' . . . but a stop may be too

long if it involves 'delay unnecessary to the legitimate investigation of the law enforcement

officers.'" *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (quoting *United States v.*

*Sharpe*, 470 U.S. 675, 685 (1985)).

To determine whether an investigative stop became an arrest, the Court must consider

several factors:

> (1) the number of officers and police cars involved; (2) the nature of the crime and
> whether there is reason to believe the suspect might be armed; (3) the strength of
> the officers' articulable, objective suspicions; (4) the erratic behavior of or
> suspicious movements by the persons under observation; and (5) the need for
> immediate action by the officers and lack of opportunity for them to have made the
> stop in less threatening circumstances.

*Pollreis*, 9 F.4th at 745. The Court addresses each factor in turn.

First, the Court considers "the number of officers and police cars involved." *Id.* When

analyzing this factor, the Eighth Circuit has considered whether the number of officers

"display[ed] an excessive police presence." *United States v. Childers*, 73 F.4th 960, 964 (8th Cir.

2023). In Woods's Motion to Suppress, he claims that "two officers and two police vehicles

were present when Mr. Woods was handcuffed." Doc. 34 at 6. The record supports that Officer

Carvajal was the only officer on scene when he ordered Woods out of the Jeep and onto the

ground. Doc. 54, Evid. Tr. at 21:15–21:18.; Ex. B (Officer Carvajal's body camera) at 00:00–

01:28. Another officer, however, did arrive shortly after Woods laid on the ground. Ex. B

(Officer Carvajal's body camera) at 00:00–01:32. That officer held Woods's arms so Officer

Carvajal could place Woods in handcuffs. *Id.* at 01:29–02:05. Two officers and two police cars are not a display of an excessive police presence given that officers had reasonable suspicion that Woods possessed the stolen firearm. *See Childers*, 73 F.4th at 964 (concluding that seven police officers on scene "did not display an excessive police presence given that an illegal firearm discharge had been reported involving three individuals in a public park"). As such, this factor weighs in favor of an investigative stop.

Second, the Court considers "the nature of the crime and whether there is reason to believe the suspect might be armed." *Pollreis*, 9 F.4th at 745. When examining this factor, the Eighth Circuit has considered whether the "nature of the suspected crime elevated police concerns for the safety of the public and themselves" and whether "[i]t was reasonable to believe that the persons [officers] identified and approached might be armed." *See Childers*, 73 F.4th at 964. Woods claims that Officer Carvajal knew only that the Jeep was wanted in connection with theft of a firearm, that Officer Carvajal had no information that Woods was a suspect, and that neither Woods's behavior nor appearance suggested he was armed. Doc. 34 at 7. The record supports—and Woods concedes—that Officer Carvajal knew that the Jeep was involved in a theft of a firearm. Officer Carvajal testified that the fact the Jeep was wanted for its involvement in the theft of a firearm raised safety concerns for him. Doc. 54, Evid. Tr. at 18:9–18:16. Because the Jeep was wanted for its involvement in theft of a firearm, Officer Carvajal had reasonable suspicion that the driver of the wanted vehicle was armed. As such, this factor weighs in favor of an investigative stop.

Third, the Court considers "the strength of the officers' articulable, objective suspicions." *Pollreis,* 9 F.4th at 745. Woods claims that Officer Carvajal "knew almost nothing." Doc. 34 at 7. Specifically, Woods claims that Officer Carvajal did not know when the theft occurred, if the

Jeep belonged to the theft victim or suspect, or anything about the suspect. *Id.* The record reflects that—regardless of whether he knew the date—Officer Carvajal knew the Jeep was wanted in connection of a theft of a firearm. Doc. 54, Evid. Tr. at 17:4–5. Additionally, after identifying the Jeep as the wanted vehicle, Officer Carvajal observed a man, later identified as Woods, "running out of the QuikTrip with numerous items"—which were later determined stolen—and entering the Jeep. *See id.* at 17:25–18:3; 23:1–23:13. Officer Carvajal had articulable, objective suspicions that Woods was engaged in criminal activity. Officer Carvajal had reasonable suspicion that: (1) the Jeep was associated with a theft of a firearm; (2) the driver of the Jeep committed the theft, and (3) the driver of the Jeep possessed the stolen firearm. As such, this factor weighs in favor of an investigative stop.

Fourth, the Court considers "the erratic behavior of or suspicious movements by the persons under observation." *Pollreis,* 9 F.4th at 745. Woods claims that he "did not act erratically or suspiciously" and "complied with Officer Carvajal's commands." Doc. 34 at 7. However, the record reflects that Officer Carvajal observed a man, later identified as Woods, "running out of the QuikTrip with numerous items"—which were later determined stolen—and entering the wanted Jeep. *See* doc. 54, Evid. Tr. at 17:25–18:3; 23:1–23:13. Woods took his time getting out of the Jeep and did not appear anxious or particularly hurried when Officer Carvajal ordered him out of the Jeep. *See* Ex. B (Officer Carvajal's body camera) at 00:00–1:30. Before exiting the Jeep, Woods reaches for his chips, hot dogs, and soda in attempt to exit the Jeep with them. *Id.* at 00:40–1:05. He then changes his mind, placing the chips and hot dogs on his dash, exiting the Jeep, and placing his soda on the ground. *Id.* Woods eventually lays on the ground and "reached for his bag with his right hand" before the officers placed him in handcuffs. Doc. 54, Evid. Tr. at . 21:9–21:12; *see also* Ex. B (Officer Carvajal's body camera) at 0:56–1:05.

14

Officer Carvajal testified that the bag raised concerns because it's "easy to hide a firearm inside those bags." Doc. 54, Evid. Tr. at 20:2–20:5. As such, this factor weighs in favor of an investigative stop.

Fifth, the Court considers "the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances." *Pollreis,* 9 F.4th at 745. Woods claims that "Officer Carvajal could have made the stop in less threatening circumstances." Doc. 34 at 7. Additionally, Woods claims that Officer Carvajal could have called "RTCC to confirm that the Jeep he was looking at was the Jeep at issue in the report" and that "[n]othing indicated that Mr. Woods would have attempted to flee or destroy evidence." *Id.* The Court has already established above that it was reasonable for Officer Carvajal to fear for his safety because the Jeep was wanted in connection with theft of a firearm, Woods was slow to comply, and Woods disobeyed commands. At the time of the stop, Officer Carvajal was on scene by himself and feared for his safety. Doc. 54, Evid. Tr. at 16:4–18:28. Additionally, Officer Carvajal testified that he called RTCC for assistance in finding the car. *Id.* at 16:13–16:23. As such, this factor weighs in favor of an investigative stop.

When considering the totality of the circumstances, analysis of the factors favor concluding that the investigative stop was not transformed into an arrest. *See Pollreis*, 9 F.4th at 746 (concluding that the investigative detention did not become an arrest based on the "totality of the circumstances," even though the officer put the suspects in handcuffs). Although Officer Carvajal approached Woods's vehicle with his weapon drawn and ordered him to the ground, those measures did not transform the encounter into a de facto arrest. The Eighth Circuit "has held that neither the partial blocking of a suspect's automobile nor the officers' approach to a suspect's car with guns drawn elevates an investigative stop into an arrest 'if the police action is

15

reasonable under the circumstances.'" *Raino*, 980 F.2d at 1149 (quoting *United States v. Jones*, 759 F.2d 633, 638 (8th Cir. 1985)). Likewise, the Eighth Circuit has held that "drawing a firearm and handcuffing the suspect does not automatically transform an investigatory stop into an arrest under *Terry*" when "an officer has reason to believe a suspect is armed." *Childers*, 73 F.4th at 964 (quoting *Johnson*, 31 F.4th at 623). Here, as previously stated, Officer Carvajal had reasonable suspicion that: (1) the Jeep was associated with a theft of a firearm; (2) the driver of the Jeep committed the theft, and (3) the driver of the Jeep possessed the stolen firearm. Officer Carvajal encountered Woods at a QuikTrip with consumers. The use of Officer Carvajal's drawn weapon and firm commands were therefore justified as a precautionary safety measure during a lawful investigatory stop. "[A]n officer may take such steps as are 'reasonably necessary to protect [his] personal safety and to maintain the status quo' so that the limited purposes of the stop may be achieved." *Raino,* 980 F.2d at 1149 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Once the scene was secure, Officer Carvajal promptly verified Woods's identity and determined probable cause for arrest. Doc. 54, Evid. Tr. at 23:1–23:18; Ex. B (Officer Carvajal's body camera) at 04:00–07:47. The level of force used was proportionate to the potential danger and did not exceed the scope of a permissible *Terry* stop.

Accordingly, the Court overrules Woods's objections, doc. 59 at 2–3.

### a.      Miscellaneous objections

Woods objects to terms used during the evidentiary hearing and in the R&R. Doc. 59 at 3.

### i.      Use of the term "suspect"

Woods takes issue with Officer Carvajal referring to Woods as a "suspect" during his testimony at the evidentiary hearing. Doc. 59 at 3. Specifically, Woods takes issue with Officer

16

Carvajal testifying that he set up a surveillance "[b]elieving that the suspect would go to the vehicle if [Officer Carvajal] wasn't there." Doc. 54, Evid. Tr. at 17:10–17:14; *see also* doc. 59 at 3. This lacks merit. At some point (and rather quickly), Woods became a suspect. So, Officer Carvajal referring to Woods as a suspect in his testimony may merely reflect that once Officer Carvajal determined Woods to be a suspect, he used that term to refer to Woods generally rather than to denote Woods's status at any given point during the events in question.

The use of the term "suspect" does not affect the Court's determination on any of Woods's motions now before the Court. The Court therefore overrules Woods's objection, doc. 59 at 3.

### ii.　　Use of the term "robbery"

Woods also takes issue with the Judge Bodenhausen's conclusion that "Officer Carvajal had a reasonable suspicion that (1) the Jeep was associated with a robbery earlier that day; and (2) that the driver of the Jeep was likely the person who committed the robbery and possessed the stolen property." Doc. 58 at 13; *see also* doc. 59 at 3. Woods points out that "there was no evidence of a robbery." Doc. 59 at 3. The Court agrees that the record reflects the Jeep was wanted in connection with a theft of a firearm (not a robbery). *See, e.g.*, doc. 54, Evid. Tr. at 174–5. While that distinction could under some circumstances have relevance to a court's analysis of a particular scenario, the Court finds it has no relevance here. The robbery/theft-of-firearm distinction does not alter the Court's analysis of the facts because the totality of the evidence more than supports a finding of reasonable suspicion. As explained above, the Court finds Officer Carvajal had reasonable suspicion that: (1) the Jeep was associated with a theft of a firearm; (2) the driver of the Jeep committed the theft, and (3) the driver of the Jeep possessed the stolen firearm. The Court therefore overrules Woods's objection, doc. 59 at 3.

### iii.        Observing Woods's bag

Woods takes issue with the Judge Bodenhausen's conclusion that Officer Carvajal's "suspicion increased when Officer Carvajal observed Woods rapidly leaving the QuikTrip wearing a cross-body band [sic] and carrying items in his hands and entering the wanted Jeep." Doc. 58 at 13; *see also* doc. 59 at 3.  The Court agrees with Woods that Officer Carvajal testified that he saw the cross-body bag after he exited the patrol car with his firearm aimed at Woods. Doc. 54, Evid. Tr. at 19:4–19:22.  This finding does not affect the Court's determination of any of Woods's motions now before the Court.

### 2.        Search of the bag

Woods challenges the search of his bag, which led to the discovery of two magazines. Doc. 59 at 3–5.  The Court addresses each of Woods's arguments below in addition to whether Woods gave officers consent to "check" his bag.

### a.        Woods's consent

Exhibit B (Officer Carvajal's body camera) shows that Officer Carvajal tells Woods, "Don't f*cking reach, dude," and Woods responds with, "I'm not, bro.  I ain't got nothing. Check it, bro.  Ain't nothing in there, man."  Exhibit B (Officer Carvajal's body camera) at 1:20–1:30.  While neither the parties nor the R&R addressed this request by Woods, the Court on de novo review finds, based on Officer Carvajal's body-camera evidence, that Woods requested Officer Carvajal to search his bag, thereby providing consent.  *See id.*  And as discussed above, Woods requested to have Officer Carvajal search his bag before the officers handcuffed him, but while Officer Carvajal had his firearm drawn.  *See id.*

"[T]he question [of] whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the

totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "In deciding whether a consent was voluntary, courts should require the prosecution to prove voluntariness by a preponderance of the evidence." *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990).

"The following characteristics of persons giving consent are relevant when assessing the voluntariness of their consent: (1) their age, (2) their general intelligence and education, (3) whether they were intoxicated or under the influence of drugs when consenting, (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights, and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system." *Chaidez*, 906 F.2d at 381 (cleaned up).

Woods has had substantial and prolonged exposure to the criminal-justice system. At the time of the incident, Woods was a 48-year-old who had 19 criminal cases brought against him, as well as numerous arrests without conviction, dating back to at least 1993. *See* doc. 14. He explained to the Pretrial Officer that he received his GED in 2009 while incarcerated in the Missouri Department of Corrections. *Id.* at 2. No evidence in the record suggests that Woods was intoxicated or under the influence of drugs when consenting, or that Officer Carvajal told Woods of his right to withhold consent. Woods told Officer Carvajal to "check" his bag roughly one minute after they encountered each other and before he was placed in handcuffs. *See* Ex. B (Officer Carvajal's body camera) at 00:34–01:30. Woods has been in federal and state custody and supervised release or probation multiple times over the 31 years preceding his instant encounter with law enforcement. *Id.*

"In examining the environment in which consent was given, courts should ask whether the person who consented: (1) was detained and questioned for a long or short time, (2) was

threatened, physically intimidated, or punished by the police, (3) relied upon promises or misrepresentations made by the police, (4) was in custody or under arrest when the consent was given, (5) was in a public or a secluded place, or (6) either objected to the search or stood by silently while the search occurred." *Chaidez,* 906 F.2d at 381 (cleaned up).

First, the Court examines whether Woods "was detained and questioned for a long or short time." *Id.* At the time of the consent, Officer Carvajal did not question Woods at all. Instead, Woods told Officer Carvajal to "check" his bag to prove he "ain't got nothing" after Officer Carvajal said, "[d]on't f*cking reach, dude." Ex. B (Officer Carvajal's body camera) at 00:34–1:30. The request came roughly a minute after Woods and Officer Carvajal encountered each other. *Id.*

Second, the Court must consider  whether Woods "was threatened, physically intimidated, or punished by the police." *Chaidez,* 906 F.2d at 381. Officer Carvajal had his firearm drawn when he ordered Woods out of the Jeep and onto the ground. Ex. B (Officer Carvajal's body camera) at 0:00–1:30. While this complicates the issue at hand, it does not dispose of it. Although Officer Carvajal had his firearm drawn, Woods didn't appear intimidated by Officer Carvajal or concerned about his safety. *See* Ex. B (Officer Carvajal's body camera) at 00:00–1:30. Woods took his time getting out of the Jeep and did not appear anxious or particularly hurried. *See id.* Before exiting the Jeep, Woods reaches for his chips, hot dogs, and soda in an attempt to exit the Jeep with them. *Id.* at 00:40–1:05. He then changes his mind, placing the chips and hot dogs on his dash, exiting the Jeep, and placing his soda on the ground. *Id*. Woods then lays on the ground and  is placed in handcuffs. *Id.* at 00:56–1:50. In short, even though Officer Carvajal had his firearm drawn, Woods engaged in deliberative and methodical conduct. This behavior is consistent with Woods's being a seasoned veteran of law-enforcement

20

encounters and is even more so when considering Woods had dashed out of QuikTrip with apparently stolen goods in his hands. *Id.*; *see also* doc. 14 at 3–10.

Third, the Court considers whether Woods "relied upon promises or misrepresentations made by the police." *Chaidez,* 906 F.2d at 381. The record reflects no promises or representations of any kind by the police.

Fourth, the Court must examine whether Woods "was in custody or under arrest when the consent was given." *Id.* The record reflects that Woods was in custody for roughly a minute. *See* Ex. B (Officer Carvajal's body camera) at 00:34–1:30.

Fifth, the Court must consider whether consent "was [given] in a public or a secluded place." *Chaidez,* 906 F.2d at 381. Woods gave consent in the public space outside of a QuikTrip, which had several vehicles in the parking lot. *See* Ex. B (Officer Carvajal's body camera) at 00:00–1:30. This

Sixth, and lastly, the Court examines whether Woods "either objected to the search or stood by silently while the search occurred." *Chaidez,* 906 F.2d at 381. While Woods objected to the search of the Jeep, Ex. A (Officer Taluva's body camera) at 01:55–02:27, he did not object to the search of the bag. The videos that contain parts of the searches show that Woods remained silent and expressed no objection to the searches of his bag. Ex. B (Officer Carvajal's body camera) at 01:20–03:50; Ex. C at 40:00–41:35. And as noted, Woods said to "check it." Ex. B (Officer Carvajal's body camera) at 1:20–1:30.

After considering the totality of the circumstances surrounding Woods's stating "check it," the Court concludes that Woods's gave knowing, voluntary consent for Officer Carvajal to "check" his bag. Accordingly, the Court finds that the search of Woods's bag did not violate Woods's Fourth Amendment Rights. *See United States v. Meza-Gonzalez*, 394 F.3d 587, 592

21

(8th Cir. 2005) ("A consensual search does not violate the Fourth Amendment if the consent is given voluntarily and without coercion.").  Nonetheless, the Court will address Woods's objections.

### b.    Attenuation doctrine

Woods next objects to Judge Bodenhausen's conclusion that the attenuation doctrine applies.  Doc. 59 at 3–5.  Judge Bodenhausen concludes that, even if Officer Carvajal lacked reasonable suspicion, the Court need not suppress the evidence because the "[d]iscovery of the outstanding bench warrant and learning that Woods had taken items from QuikTrip without paying attenuate the taint of any possible constitutional deficiency concerning the initial seizure."  Doc. 58 at 16.

Woods argues that "even assuming *arguendo* that police developed a lawful basis to arrest Mr. Woods after the initial seizure, that does not satisfy the attenuation doctrine by itself."  Doc. 59 at 4 (emphasis in original).  Woods claims that "[e]ven after the attenuating circumstance, the later discovery of evidence must still occur during a *lawful* search."  *Id.*  Citing *Arizona v. Gant*, 556 U.S. 332, 339 (2009), Woods contends that a "lawful search incident to arrest may only include the arrestee's person and the areas within his immediate control—those are the 'boundaries' of the exception."  Doc. 59 at 4.  Woods claims that the search of his bag was not a lawful search incident to arrest because he was handcuffed and officers had control of the bag.  *Id.*

The Eighth Circuit, however, has "rejected the notion that an officer's exclusive control of an item necessarily removes the item from the arrestee's area of immediate control."  *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010).  In this case, officers did remove the bag from Woods's person; however, the bag was tossed on the ground only feet away from Woods

22

while the officers were handcuffing him. *See, e.g.*, Ex. B (Officer Carvajal's body camera) at 02:00–03:45, 04:40–04:45, 07:50–07:55, 08:37–08:39, 10:05–12:22; Ex. C 26:02–29:49. As such, the bag was within "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel v. California,* 395 U.S. 752, 763 (1969).

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions." *Id.* at 238. The Court must consider three factors to determine whether the attenuation doctrine applies. *Id.* at 239. First, the Court must "look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search." *Id.* (citation omitted). Second, the Court must consider "the presence of intervening circumstances." *Id.* (citation omitted). And third, the Court must examine "the purpose and flagrancy of the official misconduct." *Id.* (citation omitted).

Judge Bodenhausen concluded that the first factor, "temporal proximity," favors suppression. Doc. 58 at 17. Woods takes issue with Judge Bodenhausen's statement that "'very little time' passed between the stop's initiation and the seizure of incriminating evidence from the cross-body bag." Doc. 59 at 4 (citation modified); *see also* doc. 58 at 17. Based on the videos in evidence, it appears Officer Taluva first searched the bag less than a minute after handcuffing Woods, Ex. B (Officer Carvajal's body camera) at 1:30–3:00. However, another video shows

23

Officer Taluva removing the magazines from the bag about 40 minutes after Woods's arrest, Ex. C at 40:15–41:25. Either way, this factor favors suppression, which favors Woods.

Judge Bodenhausen concluded that the second factor, "the presence of intervening circumstances," favors the United States. Doc. 58 at 17. Specifically, the R&R points out that officers learned two important facts shortly after detaining Woods: "(1) Woods had an outstanding bench warrant; and (2) Woods had taken several items from QuikTrip without paying for them." *Id.* "Thus, the police encountered additional facts and circumstances that justified arresting Woods independent of any alleged theft earlier in the day." Doc. 58 at 17. The Court agrees with Judge Bodenhausen's conclusion that this factor favors the United States.

Judge Bodenhausen concluded the third factor, "the purpose and flagrancy of the alleged official misconduct," also favors the United States. *Id.* Specifically, the R&R points out that "[n]othing in the record suggests anything close to misconduct that would justify the application of the exclusionary rule based on the decision to block in the Jeep and detain Woods." *Id.* at 18; *see also United States v. Lowry*, 935 F.3d 638, 643 (8th Cir. 2019) (explaining that "[f]or the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure" (quoting *Strieff*, 579 U.S. at 243)). Woods does not raise any objections to this specific finding. *See* doc. 59. The Court agrees with Judge Bodenhausen's conclusion that this factor favors the United States.

Having reviewed the record, the Court overrules Woods's objections, doc. 59 at 3–5, and finds the attenuation doctrine would apply in the event the initial seizure was unlawful.

### 3.     Search of the Jeep

Woods objects to Judge Bodenhausen's "conclusion that police had probable cause to search the Jeep and could search it under the automobile exception." Doc. 59 at 5. "For an

24

automobile or other vehicle, the general rule is that officers may conduct a search, without a warrant, if they have probable cause to believe that evidence of a crime or contraband will be found inside." *United States v. Crawford*, 93 F.4th 436, 440 (8th Cir. 2024) (citing *United States v. Pacheco*, 996 F.3d 508, 513 (8th Cir. 2021)). The Jeep was wanted in connection to a theft of a firearm and officers had probable cause to believe that evidence of the stolen firearm would be found inside of the Jeep. *See* doc. 54, Evid. Tr. at 17:4–6. Judge Bodenhausen found, and Woods did not object, that "Officer Carvajal was working as part of a larger investigatory team." Doc. 58 at 15. Specifically, "Hazelwood Police, the SLMPD RTCC, and Officer Carvajal were working together and cooperatively, and there was sufficient communication between them concerning the Jeep and why it was wanted." *Id.*; *see also United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000) ("Probable cause may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if . . . some degree of communication exists between them."). Judge Bodenhausen further found that "before Woods was taken into custody, the investigative team had amassed substantial evidence, including video evidence, showing that the driver of the Jeep stole the bag and firearm, that Woods was indeed the driver, and that Woods was wearing a cross-body bag at the time of his encounter." Doc. 58 at 22–23. Judge Bodenhausen therefore concluded that "there was a strong likelihood that evidence of the crime would be found inside the Jeep." *Id.* at 23. Having reviewed the record, the Court agrees with Judge Bodenhausen that the automobile exception applies. Doc. 58 at 23.

Woods again raises that the R&R erroneously used the term "robbery" instead of "theft of a firearm." Doc. 59 at 3. As noted above, the Court finds this has no bearing on the analysis.

Woods next objects to Judge Bodenhausen's "conclusion that the police could rely on the warrant to search the Jeep." Doc. 59 at 5. Woods argues that the warrant search was tainted by

Woods's alleged unlawful arrest.  *Id.*  Additionally, Woods argues that because officers placed Woods's bag into the Jeep and then used the bag's presence in the Jeep as the basis for probable cause, any evidence seized from the warrant requires suppression.  *Id.* at 5–6.

The Court has already determined that under the automobile exception officers had probable cause to search the Jeep without a warrant.  Nevertheless, the Court agrees with Judge Bodenhausen's conclusion that the judge issuing the warrant had a substantial basis to conclude that probable cause existed.  As such, the Court overrules Woods's objections.  Doc. 59 at 5–6.

## V.     Conclusion

Accordingly, the Court (1) overrules Woods's [59] objections, except as noted above; (2) sustains, adopts, and incorporates Judge Bodenhausen's [58] Report and Recommendation, excepted as noted above; (3) denies Woods's [32] Motion to Dismiss; (4) grants Woods's [33] Motion to Suppress Statements; and (5) denies Woods's [34] Motion to Suppress Evidence.

So ordered this 2nd day of December 2025.

_SL R. CL_

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE